1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8    GILBERT MICHAEL GREENWOOD,

9                          Plaintiff,                    Case No. C21-5874-JHC-MLP

10          v.

11   PIERCE COUNTY, *et al.*,                            REPORT AND RECOMMENDATION

12                          Defendants.

13

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Gilbert

Greenwood is currently confined at the Stafford Creek Corrections Center in Aberdeen,

Washington. The claims asserted in this action arise out of Plaintiff's pretrial detention at the

Pierce County Detention and Correction Center ("PCDCC") in 2018-19. Plaintiff alleges in his

amended complaint, the operative complaint in this action, that Miguel Balderrama, M.D.,

violated his Fourteenth Amendment right to receive adequate medical care while he was

confined at the PCDCC.[1] (*See* Am. Compl. (dkt. # 8) at 4-26.)

---

[1] Plaintiff also identified Pierce County as a Defendant in his amended pleading, but that Defendant was
previously dismissed from this action. (*See* Am. Compl.; dkt. ## 14, 32, 37.)

REPORT AND RECOMMENDATION
PAGE - 1

Dr. Balderrama now moves for summary judgment in this action (Def.'s Mot. (dkt. # 52)), and he has submitted a declaration in support of his motion (Balderrama Decl. (dkt. # 53)). Plaintiff has filed a response opposing Defendant's motion for summary judgment (Pl.'s Resp. (dkt. # 60)), and he has likewise submitted a declaration in support of his motion (Greenwood Decl. (dkt. # 61)) together with a number of exhibits (Greenwood Decl. Exs. (dkt. # 61-1)). Defendant has filed a supplemental reply brief in support of his motion. (Reply (dkt. # 65)).[2]

The Court, having reviewed Plaintiff's amended complaint, Defendant's motion for summary judgment, and the briefing of the parties, concludes that Defendant's motion for summary judgment should be granted and that Plaintiff's amended complaint and this action should be dismissed with prejudice.

## II.    BACKGROUND

### 1.    Plaintiff's Claims

Plaintiff alleges in his amended complaint that Dr. Balderrama violated his rights under the Fourteenth Amendment when he failed to provide timely and adequate care for Plaintiff's syringomyelia, a disorder involving the spinal cord, and for his gastroesophageal reflux disease ("GERD"). (See Am. Compl. at 4-19.) According to the allegations in the amended complaint, syringomyelia is a disease in which a fluid-filled cavity called a syrinx forms within the spinal cord and if not surgically decompressed, "can permanently block blood flow resulting in spinal cord nerve cell death, or atrophy." (Id. at 6-7.) Plaintiff asserts that Dr. Balderrama ignored his

---

[2] Plaintiff's response to Defendant's summary judgment motion was not timely filed and Defendant had apparently not yet seen the response at the time he filed his original reply brief. (See dkt. ## 60, 62.) The Court subsequently accepted Plaintiff's late-filed response and granted Defendant an opportunity to file a supplemental reply brief addressing the arguments presented therein. (See dkt. ## 64, 65.)

repeated requests for care in relation to his syringomyelia, which delayed necessary testing and treatment, and ultimately resulted in Plaintiff suffering permanent neurological damage. (*See id*. at 4-19.)

Plaintiff also alleges that Dr. Balderrama and other members of the medical staff ignored his complaints regarding his stomach issues, including difficulty swallowing and an inability to keep food down, and that Dr. Balderrama refused to meet with him and provide him his longstanding prescription for Nexium which caused him to suffer "unbearable" stomach pain for a year. (Am. Compl. at 8-11, 17, 19.)

2.    *Facts*

Dr. Balderrama is employed by Pierce County and is the Medical Director for the PCDCC. (Balderrama Decl. at ¶ 2.) In his capacity as Medical Director, Dr. Balderrama was one of the medical providers who provided care to Plaintiff during his incarceration at the PCDCC. (*Id*.) Pierce County contracts with NaphCare, Inc. ("NaphCare") to provide medical services for PCDCC inmates. (*Id*. at ¶ 3.) NaphCare employees review and respond to electronic kiosk requests, also known as kites, submitted by inmates relating to medical care. (*See id*. at ¶ 4.) Inmates are either added to the "sick call" list or a clinic appointment is scheduled, depending on the nature of the request. (*See id*.)

Plaintiff entered the PCDCC on June 18, 2018. (Balderrama Decl. at ¶ 5; Greenwood Decl. at ¶ 3.) Upon Plaintiff's entry into the facility, a receiving screening was conducted by a NaphCare nurse who noted that Plaintiff had a history of "Spinal cord tumor." (Greenwood Decl. Exs. at 35-36.) On June 20, 2018, Plaintiff sent an electronic kiosk request asking to see a doctor for "Barrets [sic] esopgogus [sic] and srygomela [sic] disease." (Balderrama Decl. at ¶ 9, Ex. A at 5.) Plaintiff indicated therein that he needed to see a doctor "immediately" because "one is life

threatening and symptoms show." (*Id.*, Ex. A at 5.) Plaintiff also indicated that he needed "nexium or generic daily" and that he was "hav[ing] trouble keeping food down." (*Id.*) Plaintiff misdirected his kite to the classification staff and he was instructed to contact the cluster officer if it was an emergency or to kite the medical clinic. (*See id.*) There is no indication that Plaintiff ever redirected his kite to the medical staff.

On June 21, 2018, Plaintiff was seen by NaphCare registered nurse ("RN") Elizabeth Warren, for two separate complaints: "Jungle Foot" and severe gastric reflux. (*See* Balderrama Decl. at ¶¶ 10-11, Ex. C at 1-2.) With respect to the gastric reflux, Plaintiff reported to RN Warren that he had been taking Prilosec for 20 years. (*See id.* at ¶ 11, Ex. C at 1-2.) Plaintiff's medical chart notes reflect that RN Warren contacted Dr. Balderrama regarding Plaintiff's complaints, and that Dr. Balderrama prescribed medication for both conditions, including Zantac (ranitidine) for the gastric reflux to be taken once a day in the morning. (*Id.* at ¶ 13, Ex. B at 1, Ex. C at 2.) There is no indication in the chart notes that Plaintiff complained of any active symptoms of syringomyelia during his encounter with RN Warren on June 21, 2018.

On June 22, 2018, Plaintiff submitted an electronic kiosk request asking that his antacid be changed from morning to evening, and also indicating that he needed it twice a day, in both the morning and the evening. (*See* Balderrama Decl. at ¶ 14, Ex. A at 7.) Two days later, in response to that request, NaphCare physician's assistant Bonnie Joy changed Plaintiff's ranitidine prescription to twice per day. (*See id.* at ¶ 15, Ex. B at 1, Ex. C. at 2.)

On July 25, 2018, Plaintiff submitted an electronic kiosk request asking that he be provided Prilosec (omeprazole) twice per day for his stomach acid. (Balderrama Decl., Ex. A at 14.) Plaintiff also appeared to request in his kite that Nexium (esomeprazole) once a day be considered as an alternative, and he indicated that if his requests were refused, he would need a

REPORT AND RECOMMENDATION
PAGE - 4

doctor's appointment. (*See id.*) Plaintiff was seen at sick call by RN Warren on July 27, 2018, and at that time Plaintiff apparently requested that he be given both Prilosec and Nexium. (*See id.* at ¶ 16, Ex. C at 2.) Dr. Balderrama thereafter discontinued the ranitidine and prescribed omeprazole for Plaintiff to take twice a day. (*See id.* at ¶ 16, Ex. B at 1, Ex. C at 3.) Plaintiff's omeprazole prescription continued through September 5, 2018, and was discontinued when Plaintiff was transferred to Western State Hospital. (*Id.* at ¶¶ 17-18, Ex. B at 1.) When Plaintiff returned from Western State Hospital on September 20, 2018, he was once again prescribed omeprazole twice per day, and that continued until his release from PCDCC custody in June 2019. (*Id.* at ¶ 19, Ex. B at 1-2.)

On November 6, 2018, Plaintiff had a chronic care appointment with NaphCare nurse practitioner ("NP") Christie Steele. (*See* Greenwood Decl. Exs. at 26-28, 43-44.)[3] The report detailing that appointment indicates that the reason for the visit was to monitor Plaintiff's "history of spinal cord tumor removal." (*Id.* at 27.) However, the only neurological deficit noted in the report was Plaintiff's mental status, and the remainder of the neurological assessment was normal. (*See id.* at 28.) Likewise, Plaintiff's musculoskeletal assessment was normal as to the aspects that were assessed, in particular, Plaintiff's upper and lower extremities. (*Id.*) NP Steele also assessed Plaintiff's abdomen and noted a number of issues, including abdominal tenderness and hepatic enlargement, nausea, and jaundice. (*See id.* at 43-44.) As to these issues, NP Steele noted that the Level of Disease Control was "Poor." (*See id.* at 28, 43.) Finally, the report suggests that Plaintiff made no complaints of chronic pain during that appointment. (*See id.* at

---

[3] Plaintiff submitted the report of the chronic care visit as an exhibit to his declaration in support of his opposition brief but the pages that comprise the report were presented out of order. (*See* Greenwood Decl. Exs. at 1-47.) However, the Court is able to discern from the Bates stamp that appears at the bottom of each page that all are a part of the same report. (*See id.* at 26-28, 43-44 (DEFS PC 400390-DEFS PC 400394).)

28.)

On November 13, 2018, Plaintiff submitted an electronic kiosk request in which he stated "For past 2 weeks I have experienced increased pressure on right side of head by right ear. I am loosing [sic] hearing in right ear now at 50 percent. Cannot sleep. For past week I have lost sensation on bottom of feet and backside of arms especially when I cough or clear my throat. Also loss of strength and mobility in left hand." (*See* Balderrama Decl. at ¶ 20, Ex. A at 44.) Plaintiff was placed on the sick call list and was seen by RN Warren on November 16, 2018. (*See id.*, Ex. A at 44-45, Ex. C at 3.) Plaintiff's medical chart notes for that appointment indicate that he was being seen for the issues reported in his November 13, 2018, kite. (*See id.*, Ex. C at 3.) However, during his encounter with RN Warren, Plaintiff complained only that he would get an upset stomach when he took his medications, that the medications made him feel "weird," and that he was not able to sleep when he took his medications (*Id.*) Plaintiff was at that time taking two medications to treat mental health issues, and it appears it was these medications that were causing him concern. (*See id.*, Ex. A at 45-46, Ex. B at 1-2.) RN Warren encouraged Plaintiff to follow up with mental health. (*Id.*, Ex. C at 3.)

On November 20, 2018, Plaintiff submitted another electronic kiosk request in which he "inform[ed]" the medical staff that "my sringomyella [sic] disease is getting worse. I have more sensation loss in my feet and arms." (Balderrama Decl. at ¶ 22, Ex. A at 48.) Plaintiff went on to add that "if not fixed quickly it can lead to permanent paralysis and may cause me to require a respirator for survival or lead to death." (*See id.*, Ex. A at 48.) Plaintiff was advised that he had been placed on the sick call list. (*Id.* at 49.)

On November 22, 2018, before being seen by the medical staff for his concern regarding his syringomyelia, Plaintiff submitted another electronic kiosk request in which he reported that

REPORT AND RECOMMENDATION
PAGE - 6

he had had an upset stomach and swelling/gas in his stomach for the past two weeks. (Balderrama Decl., Ex. A at 49.) He also reported that he had sore glands in his neck, "the start of chills," and almost no sleep during that two-week period. (*Id*.) Plaintiff was advised that he was "on the list," and he was seen by RN Warren later the same day. (*Id*., Ex. A at 49, Ex. C at 3-4.) When seen by RN Warren, Plaintiff complained only of abdominal pain; the medical chart notes of that encounter reveal no complaints of symptoms of syringomyelia. (*See id*. at ¶ 23, Ex. C at 3-4.) Plaintiff continued to complain of stomach issues over the next two days, and he was prescribed additional medication and was seen again in sick call on November 24, 2018, to address those issues. (*Id*., Ex. A at 50-52, Ex. C at 4.)

On November 25, 2018, Plaintiff submitted an electronic kiosk request in which he stated "I am concerned the spinal cord compression from my sryngomyella [sic] is affecting the nerves controlling autonomous breathing function. I have some sensation loss in feet and arms and some motor control loss." (*See* Balderrama Decl. at ¶ 24, Ex. A at 52.) In the response to that kite, it was noted that Plaintiff had not raised the issue when he was seen the day before, and Plaintiff was advised he would be added back to the sick call list. (*Id*. at ¶ 24, Ex. A at 52-53.) Later the same day, November 25, 2018, Plaintiff submitted another electronic kiosk request in which he explained, in relation to the syringomyelia symptoms, that he "thought [he] was supposed to inform doctor in clinic and was waiting for them to call me[,]" though there is no indication in the record that Plaintiff was ever advised such an appointment had been scheduled. (*See id*., Ex. A at 53.)

On November 26, 2018, Plaintiff submitted an electronic kiosk request in which he stated "I am quickly losing my motor functions from permanent nerve damage. What I lose now is gone for life. I also believe it is also [sic] slowly causing breathing problems when I sleep . . . I

need help. I keep getting promised to see a doctor. I cannot let you kill me by complacency." (Balderrama Decl., Ex. A at 53.) Plaintiff was apparently seen by a member of the medical staff that same day and was advised that he would be called to the clinic to see a doctor, though no date was apparently specified. (*See id*. at 53-56.)

On November 30, 2018, Plaintiff was seen for the first time by Dr. Balderrama. (Balderrama Decl. at ¶ 25, Ex. C at 4-5.) The medical chart notes for that appointment reflect that Plaintiff's concern was that over the preceding three to four weeks he had developed weakness in both hands and tingling in both feet, and that he had experienced episodes of dyspnea (shortness of breath) and abnormal noises when doing flexion and extension of his neck. (*See id*. at ¶ 26, Ex. C at 4-5.) The notes also reflect Plaintiff's history of GERD and Barrett's esophagus. (*Id*., Ex. C at 5.) Following his examination, Dr. Balderrama explained to Plaintiff that the plan was to refer him for a neurosurgery consult and to have the medical staff continue to monitor his condition. (*Id*. at ¶ 27, Ex. C at 5.) Dr. Balderrama also indicated that they would continue to treat Plaintiff's "GI symptoms." (*Id*., Ex. C at 5.)

Later the same day, Plaintiff submitted two more electronic kiosk requests to medical to advise the medical staff of issues he had forgotten to raise with Dr. Balderrama, including medication for his stomach issues and additional information about the syringomyelia. (Balderrama Decl., Ex. A at 57.) In particular, with respect to his stomach issues, Plaintiff indicated that he forgot to ask the doctor for Maalox and simethicone, which Dr. Balderrama thereafter prescribed. (*See id*., Ex. A at 57, Ex. B at 1.) As to the syringomyelia, Plaintiff noted that he would lose sensation in his left arm and leg and gasp for breath while lying on his back with pressure on his neck, and that he had difficulty walking in a straight line. (*See id*.) In the ensuing days, Plaintiff submitted additional electronic kiosk requests advising that his symptoms

were worsening, and on December 3, 2018, Plaintiff was advised that he would be seeing a neurologist soon. (*See id*. at ¶ 28, Ex. A at 59-60.) On December 4, 2018, Dr. Balderrama made a notation in Plaintiff's medical chart indicating that the neurosurgeon was willing to evaluate Plaintiff but had requested an MRI of the spine prior to an office visit. (*Id*. at ¶ 29, Ex. C. at 6.) Dr. Balderrama also indicated that he would order the MRI that day and continue to monitor Plaintiff. (*Id*.)

On December 7, 2018, Plaintiff submitted an electronic kiosk request in which he indicated again that his symptoms were worsening, asked when he was scheduled to see the neurologist, and expressed concern about the "long delay." (Balderrama Decl., Ex. A at 61.) In response to that kite, Plaintiff was advised that dates for outside appointments could not be given, and that the provider was aware of his condition. (*See id.* at ¶ 30, Ex. A at 61.) On December 9, 2018, Plaintiff submitted an electronic kiosk request in which he noted that he had been suffering from, and complaining of, progressively worsening symptoms of syringomyelia for a month and stated that he needed an operation immediately in order to "prevent further paralysis and possible death." (*Id*., Ex. A at 63.) Plaintiff inquired as to whether there were any updates and was advised that medical was awaiting scheduling of the MRI. (*Id*. at ¶ 31, Ex. A at 63.) During this same period of time, Plaintiff continued to submit electronic kiosk requests complaining about stomach issues and his need for additional medications and treatment. (*See id*., Ex. A at 61, 63.) In response to these kites, Plaintiff was scheduled to be seen in sick call. (*Id*.)

On December 10, 2018, Plaintiff sent four electronic kiosk requests complaining of worsening symptoms of syringomyelia, including a loss of feeling in his feet, "permanent paralysis" in his left hand, bladder and bowel problems, paralysis in his legs, and breathing

difficulty. (*See* Balderrama Decl., Ex. A at 64-65; *see also* Balderamma Decl. at ¶ 32.) Plaintiff

submitted a similar electronic kiosk request the following morning, December 11, 2018 (*see id*.,

Ex. A at 66), and he was seen later that day in the PCDCC clinic by NP Steele (*see id.* at ¶ 33,

Ex. C at 6). Following her examination of Plaintiff, NP Steele advised that imaging and

follow-up were being scheduled but were not emergent at that time because Plaintiff's symptoms

appeared consistent with his previous examination. (*See id*.) Notably, despite Plaintiff's

complaints about progressing paralysis and loss of sensation in his feet and legs, NP Steele noted

that Plaintiff was able to ambulate normally without any assistive devices and with no observed

foot drop. (*Id*., Ex. C at 6.)

Following his appointment with NP Steele on December 11, 2018, Plaintiff submitted

almost daily electronic kiosk requests reporting worsening symptoms of his syringomyelia and

expressing his concerns about delays in seeing the neurologist. (Balderrama Decl., Ex. A at

66-74.) Plaintiff was advised that his providers were aware of his condition, that his condition

was being monitored, and that his appointments had been scheduled consistent with the

recommendation of the neurologist who would determine a treatment plan based on results of the

MRI he had directed be completed before the office visit. (*See id*. at 68-71; *see also* Balderamma

Decl. at ¶ 35.) Plaintiff was also scheduled to see the sick call nurse in response to his reports of

worsening symptoms and was advised to let medical know if his condition changed. (*See id*., Ex.

A at 71-73.)

On December 24, 2018, Plaintiff was transported to Franciscan Hospital in Gig Harbor

for the MRI. (Balderrama Decl. at ¶ 36.) On December 25, 2018, Plaintiff submitted an

electronic kiosk request in which he noted that the MRI confirmed his syringomyelia, explained

that paralysis was setting into his arms and legs and that he had severe pain in his neck, and

asked when the neurologist would provide treatment for his cyst. (*Id*., Ex. A at 75.) Plaintiff was advised that his appointment had been scheduled. (*See id*.) Plaintiff continued to submit electronic kiosk requests over the next few days complaining of worsening symptoms and asking for pain medication. (*See id*. at 75-76.)

On January 2, 2018, Plaintiff was seen by a neurosurgeon, Marc Goldman, M.D., who did not recommend surgical intervention, but advised that Plaintiff's symptoms be monitored and that a neurology consult be considered if Plaintiff's symptoms persisted. (*See* Balderrama Decl. at ¶¶ 37-38, Ex. C at 7-8.) Plaintiff thereafter continued to submit electronic kiosk requests inquiring about further treatment/follow-up for his syringomyelia and demanding a second opinion after being advised that Dr. Goldman had not recommended surgery. (*See id*., Ex. A at 77-80.) Plaintiff also made intermittent references to being in pain and needing pain medication. (*See id*. at 78-82.)

Plaintiff was seen again by Dr. Balderrama on March 1, 2019, for follow-up with respect to his syringomyelia. (Balderrama Decl. at ¶ 39, Ex. C at 7-8.) At that time, Plaintiff reported weakness and numbness in his lower extremities, and some tingling but no weakness in his upper extremities. (*Id*., Ex. C at 8.) Plaintiff did not report any other neurological symptoms, nor did he report any bowel or bladder symptoms. (*See id*.) Dr. Balderrama indicated in his medical chart notes that he would obtain a neurology consult for Plaintiff in accordance with the earlier recommendation of the neurosurgeon, order some basic lab work, and continue to follow-up with Plaintiff in the chronic care clinic. (*Id*.)

Following his appointment with Dr. Balderrama on March 1, 2019, Plaintiff's requests for care pertaining to his syringomyelia slowed considerably. On March 31, 2019, Plaintiff submitted an electronic kiosk request in which he advised that the syrinx in his neck was

REPORT AND RECOMMENDATION
PAGE - 11

growing again, and that it was causing "popping" and "crunching" sounds when he moved his neck. (Balderrama Decl., Ex. A at 91.) Plaintiff also reported that sensation loss was progressing again in his feet and lower legs, and that he needed to discuss his symptoms with Dr. Balderrama. (*Id.*) In response to that kite, Plaintiff was advised he had been placed on sick call to see a nurse. (*See id.*) On April 8, 2019, Plaintiff submitted another electronic kiosk request noting that he had yet to be seen by the nurse for his "progressing syrinx growth and advancing paralysis" and inquiring as to why he was being ignored. (*Id.*, Ex. A at 93.) Plaintiff was advised that he was on the list to be seen, and that the providers were aware of his condition and working on a neurology consult. (*Id.*)

On April 14, 2019, Plaintiff was seen in sick call by NaphCare RN Ashley Valencia Chalk in response to his complaints that his syrinx was getting bigger and causing more sensation loss to his leg. (Balderrama Decl., Ex. C at 9.) Plaintiff reported to RN Chalk that over the preceding two weeks he had been experiencing "cracking" in his neck when he moved his head which, in turn, caused paralysis in his feet. (*Id.*) Plaintiff did not report any other neurological deficits and it was noted that he was ambulating "independently with [a] steady gait" and that there was movement in his feet. (*Id.*) Plaintiff was advised that he was scheduled for an outside neurology appointment. (*Id.*)

Plaintiff was seen by neurologist Colin Iosso, M.D., on April 18, 2019. (Balderrama Decl. at ¶ 40, Ex. C at 9.) Dr. Iosso recommended only additional lab testing and follow-up in the summer. (*Id.*, Ex. C at 9.) On May 8, 2019, Plaintiff submitted an electronic kiosk request in which he noted that the neurologist had ordered blood tests and inquired why they had not yet been performed. (*Id.*, Ex. A at 105.). On May 14, 2019, Dr. Balderrama made a note in Plaintiff's medical chart that Plaintiff's lab results were normal. (*See* Balderrama Decl., Ex. C at 9.) Dr.

Balderrama saw Plaintiff for a final time on June 14, 2019, for monitoring of Plaintiff's syrinx. (*Id*., Ex. C at 10.) Plaintiff reported at that time that he was feeling better, though he still complained of loss of sensation in his lower extremities below the knee and some muscle weakness in his right hand, but no other neurological symptoms. (*Id*.) Dr. Balderrama noted that they would continue to follow-up, including following up with a medical provider at another institution if Plaintiff were to be released from the PCDCC. (*Id*., Ex. C at 11.) It appears that Plaintiff was released from the PCDCC into the custody of the Washington Department of Corrections on June 18, 2019. (*See* dkt. # 1-2; Greenwood Decl. Exs. at 26, 35-45.)

### III.    DISCUSSION

**A.    Applicable Standards**

*1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the non-movant's case, or by establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

Court must draw all reasonable inferences in favor of the non-moving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the non-moving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

> 2. *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that: (1) he suffered a violation of rights protected by the Constitution or created by federal statute; and (2) the violation was proximately caused by a person acting under color of state law. *See*

*Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

"The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Vicarious liability may not be imposed on a supervisory employee for the acts of their subordinates in an action brought under § 1983. *Lemire v. California Dep't of Corrs. & Rehabilitation*, 726 F.3d 1062, 1074 (9th Cir. 2013). A supervisor may, however, be held liable under § 1983 "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Jackson* v. *City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).

**B.    Analysis**

Dr. Balderrama argues that Plaintiff has no evidence that he violated Plaintiff's constitutional rights in relation to the medical care provided for Plaintiff's syringomyelia and his GERD while he was confined at the PCDCC. (Def.'s Mot. at 7-11.) Dr. Balderrama also argues that he is entitled to qualified immunity in this matter because Plaintiff cannot point to a clearly established law that was violated by Dr. Balderrama in this case.[4] (*Id*. at 11-12.)

Because Plaintiff was a pretrial detainee at times relevant to this action, his claim of

---

[4] The Court need not address this second argument because, as will be explained below, the Court concludes there is no evidence demonstrating that Dr. Balderrama violated Plaintiff's constitutional rights.

REPORT AND RECOMMENDATION
PAGE - 15

inadequate medical care arises under the Fourteenth Amendment and is evaluated under an

objective deliberate indifference standard. *See Castro v. County of Los Angeles*, 833 F.3d 1060,

1070-71 (9th Cir. 2016) (en banc); *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th

Cir. 2018). The elements of such a claim are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125 (citing *Castro*, 833 F.3d at 1071).

"With respect to the third element, the defendant's conduct must be objectively

unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular

case.'" *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071 (quoted sources omitted)).

A defendant's "mere lack of due care" is insufficient to state a Fourteenth Amendment claim. *Id.*

Thus, a plaintiff must "prove more than negligence but less than subjective intent—something

akin to reckless disregard." *Id.*

A difference of opinion between the inmate and medical authorities regarding proper

treatment does not constitute deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th

Cir. 1996); *Franklin v. Oregon State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981). The

delay of, or interference with, medical treatment for a serious medical need, however, can

amount to deliberate indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1991), *overruled on other grounds by*

*WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997) (en banc)). The inmate must show

harm resulting from the delay. *Id.*

1         *1.    GERD*

2         Plaintiff alleges that Dr. Balderrama failed to provide timely and adequate medical care

3    for his GERD. Plaintiff's primary complaint pertaining to his treatment for GERD is that Dr.

4    Balderrama failed to provide him the correct prescription medication to treat his stomach issues.

5    (*See* Am. Compl. at 8-9.) In particular, Plaintiff indicates that he wanted to be prescribed

6    Nexium, which he identifies as "generic Omeprazole," and claims it had been prescribed for him

7    when he was briefly confined at the PCDCC in 2014.[5] (*See id*. at 6, 8-9.) Plaintiff also claims

8    that the "full dosage" of the medication previously prescribed for him was "withheld." (*Id*. at

9    19.)

10         The evidence in the record confirms that Plaintiff was never provided Nexium while at

11    the PCDCC in 2018-19. (*See* Balderrama Decl., Ex. B.) Plaintiff was, however, provided other

12    medications, including Prilosec (omeprazole), that he specifically requested and that he told the

13    PCDCC medical staff he had been taking for over 20 years. (*See id*., Ex. C at 1.) The evidence

14    demonstrates that though Dr. Balderrama originally prescribed Zantac in response to Plaintiff's

15    complaints of severe gastric reflux, he subsequently discontinued the Zantac and prescribed

16    Prilosec after Plaintiff specifically requested Prilosec and/or Nexium. (*See id*., Ex. C at 2-3.)

17    Plaintiff had orders to receive 20mg of omeprazole twice a day for the remainder of his stay at

18    the PCDCC. (*See id*. at ¶ 17-19, Ex. B at 1-2.)

19         Notably, the dosage of Prilosec prescribed by Dr. Balderrama was what Plaintiff had

20    originally requested when he submitted his electronic kiosk request in July 2018 asking that he

21

22    _____

23    [5] According to Plaintiff, he originally entered the PCDCC in 2014 and received a prescription for Nexium after his outside medical records were acquired. (Am. Compl. at 6.) Shortly thereafter, Plaintiff posted bail and left the country for Asia. (*See id*.; Balderrama Decl., Ex. C at 11.) As noted above, Plaintiff was booked back into the PCDCC in June 2018. (*See* Greenwood Decl. at ¶ 3.)

be provided Prilosec. (*See* Balderrama Decl., Ex. A at 14.) However, in electronic kiosk requests submitted on December 8, 2018, and December 9, 2018, Plaintiff requested that he be provided an additional 20mg dose of omeprazole each day. (*See id.* at 63.) In response to these kites, Plaintiff was advised that he had been scheduled with the sick call nurse, though it is not clear if his request for an additional dose of omeprazole was ever addressed. Nonetheless, Plaintiff apparently never renewed this request during the remainder of his stay at the PCDCC.

The evidence shows that in addition to continuously providing Plaintiff Prilosec during his time in PCDCC custody, Dr. Balderrama and other medical providers prescribed additional medications to address Plaintiff's reported stomach issues, including simethicone and Rulox (a medication that is apparently similar to Maalox). (*See* Balderrama Decl., Ex. B at 1-2, Ex. C at 3-4.) There is no evidence that the omission of either Nexium or an additional dose of Prilosec caused Plaintiff harm or exacerbated his condition in any way. Plaintiff's complaints about the medication he was provided for his GERD reflect, at most, a difference of opinion regarding the appropriate treatment which does not rise to the level of a constitutional violation. Plaintiff offers no evidence or argument demonstrating that he was denied adequate care in relation to his GERD.

Dr. Balderrama is therefore entitled to summary judgment with respect to this portion of Plaintiff's Fourteenth Amendment claim.

### 2. Syringomyelia

Plaintiff alleges that Dr. Balderrama also failed to provide timely and effective care for his syringomyelia. In particular, Plaintiff claims that he first sought treatment for his syringomyelia after arriving at the PCDCC in June 2018, at which time he was experiencing only minor, transient, symptoms. (*See* Am. Compl. at 15.) Plaintiff claims that by mid-October 2018,

1   his symptoms had increased, and he believed surgery was necessary. (*See id*. at 8-9, 15.)

2   According to Plaintiff, he conveyed this information to two nurses with whom he met at the

3   PCDCC clinic on or about October 20, 2018, and advised them of the care he believed was

4   required, including referral to a neurologist, an MRI, and surgical decompression of the syrinx.[6]

5   (*See id*. at 8-9.) Plaintiff claims that the severity of his symptoms continued to increase in

6   November 2018 and that after five months of asking to see Dr. Balderrama, and reporting serious

7   symptoms, Dr. Balderrama finally examined him on November 30, 2018. (*Id*. at 9-10.) Plaintiff

8   maintains that this delay was "unconscionable" and "medically unacceptable." (*See id*. at 10, 14.)

9       Plaintiff also faults Dr. Balderrama for failing to elevate his treatment status to

10  "emergent" after the examination on November 30, 2018. (*See* Am. Compl. at 12, 15-16.)

11  Plaintiff claims that during the 24-days he waited to receive the MRI ordered by Dr. Balderrama,

12  he sustained permanent neurological damage and suffered severe chronic pain. (*See id*.) Plaintiff

13  maintains that Dr. Balderrama placed him at substantial risk of suffering serious harm by not

14  providing adequate care over the course of six months, and he asserts that Dr. Balderrama took

15  no measures to abate the risk of harm until after Plaintiff's spinal cord had been damaged. (*Id*. at

16  13-14.)

17      Plaintiff's claim that his reports of symptoms of syringomyelia were repeatedly ignored

18  by Dr. Balderrama, and that necessary care was denied and/or delayed for months, is directly

19  refuted by evidence in the record. The evidence demonstrates that Plaintiff first reported active

20

21  ───────────────
    [6] Plaintiff's opinion regarding the care that was required was apparently informed by his first experience
    with syringomyelia in 2001-2002, when a syrinx expanded in his spinal cord and caused "transient

22  neurologic symptoms." (*See* Am. Compl. at 6-7.) Plaintiff, who was not then in custody, reported his
    symptoms to his doctor and was quickly scheduled to see a neurologist who expedited an MRI, and a
    neurosurgeon thereafter expedited surgery to decompress the syrinx. (*See id*. at 13-14.) According to

23  Plaintiff, this entire process took just over a month. (*See id*.) Plaintiff is of the belief that Dr. Balderrama
    and the PCDCC staff should have provided the same degree of expedited care.

symptoms directly related to syringomyelia to the medical staff in a kite dated November 20, 2018. (*See* Balderrama Decl. at ¶ 22.) Notably, however, when Plaintiff was seen by a medical staff member two days later, he raised no such concerns. (*See id.* at ¶ 23, Ex. A at 48, Ex. C at 3-4.) Plaintiff expressed concerns relating directly to his symptoms of syringomyelia in another kite submitted on November 25, 2018, and he expressed those concerns directly to a member of the medical staff during an encounter on November 26, 2018. (*See id.*, Ex. A at 52-55.) Four days later, on November 30, 2018, Plaintiff was seen in the clinic by Dr. Balderrama. (*Id.* at ¶ 25, Ex. C at 7-8.)

There is no evidence in the record from which it could be reasonably inferred that the four-day interval between when Plaintiff first reported symptoms of syringomyelia directly to medical staff and when he was first examined by Dr. Balderrama constituted undue delay. There is also an absence of evidence demonstrating that Plaintiff suffered significant harm as a result of not being seen by Dr. Balderrama prior to November 30, 2018.

Plaintiff's claim that Dr. Balderrama further delayed necessary care, and thereby acted unreasonably, in failing to elevate Plaintiff's treatment status to "emergent" following his examination on November 30, 2018, is likewise not supported by the evidence. The evidence demonstrates that Dr. Balderrama contacted a neurosurgeon and ordered an MRI for Plaintiff within five days of the initial appointment, and that these follow-up appointments were completed within a month. (*See* Balderrama Decl. at ¶¶ 29, 36-37, Ex. C at 4-7.) The neurosurgeon did not recommend surgical management, despite Plaintiff's insistence in the weeks leading up to the appointment that an immediate operation was necessary to treat his syringomyelia.[7] (*See id.*, Ex. C at 6-7.) Indeed, the neurosurgeon apparently recommended no

---

[7] Plaintiff suggests in his materials that the syrinx he claims expanded and caused the symptoms he experienced in 2018 resolved naturally by spontaneously draining, as it had in the past, prior to the date

REPORT AND RECOMMENDATION
PAGE - 20

intervention at all save for an appointment with a neurologist at some future time if Plaintiff's symptoms continued. (*See id.*) The fact that the specialist determined in January 2019 that no treatment related to Plaintiff's syringomyelia was necessary at that time undermines any suggestion that the purported delay in having Plaintiff evaluated was unreasonable or that it caused him significant harm.

In addition, the Court observes that despite Plaintiff's claim that he suffered severe pain during the 24-day period of time between his appointment with Dr. Balderrama and the date of his MRI, the record does not reflect that Plaintiff made any complaints of pain to the medical staff during this period. The Court further observes that despite Plaintiff's assertion that the damage to his spinal cord resulted from Dr. Balderrama's delay in providing treatment, the only evidence Plaintiff offers to support this assertion are the results of MRIs performed following the surgical decompression of his original syrinx in 2002, which he claims show no spinal cord damage.[8] (*See* Am. Compl., Exs. 3-4.) Not only are the reports submitted by Plaintiff incomplete (*see id.*), but the most recent report is from an MRI performed in 2005 (*id.*, Ex. 3), many years before the MRI performed while Plaintiff was in PCDCC custody showed some spinal cord atrophy (*id.*, Ex. 2). Plaintiff offers no evidence that the spinal cord atrophy noted in the report of his 2018 MRI was the result of any actions attributable to Dr. Balderrama, or that Dr. Balderrama acted unreasonably in responding to Plaintiff's symptoms of syringomyelia once he became aware of them.

---

the MRI was performed on December 24, 2018. (*See* Am. Compl., Ex. 1 at 16-17; Pl.'s Resp. at 14.) This, in Plaintiff's view, would explain why the neurosurgeon deemed surgical intervention unnecessary in light of the relatively small size of the syrinx revealed during the MRI. (*See* Am. Compl., Ex. 1 at 17.) However, there is no evidence in the record to support this suggestion.

[8] There is a suggestion in the record that there may have been some spinal cord atrophy detected following the 2002 procedure. (*See* Balderrama Decl., Ex. A at 79-80.)

REPORT AND RECOMMENDATION
PAGE - 21

In sum, Plaintiff offers no evidence or argument demonstrating that he was denied adequate care in relation to his syringomyelia by Dr. Balderrama. Dr. Balderrama is therefore entitled to summary judgment with respect to this portion of Plaintiff's Fourteenth Amendment claim as well.

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Dr. Balderrama's motion for summary judgment be granted, and that Plaintiff's amended complaint and this action be dismissed with prejudice. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 8, 2023**.

DATED this 11th day of August, 2023.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 22